Augustine PONCE, et al., Plaintiffs,

v.

**CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Defendants.**

Lee W. HARRISON, et al., Plaintiffs,

v.

**CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, et al., Defendants.**

Nos. CV 76–2856–RMT, CV 81–591–RMT(PX).

United States District Court, C.D. California.

March 21, 1984.

---

Neal S. Dudovitz, Gill Deford, Nat. Senior Citizens Law Center, Los Angeles, Cal., W. Kenneth Rice, California Rural Legal Assistance, Santa Maria, Cal., Robert Ishikawa, Greater Bakersfield Legal Services, Bakersfield, Cal., Robert Bush, Taylor, Roth & Hunt, Los Angeles, Cal., for plaintiffs.

Kenneth J. Sackman, Gilbert, Cooke & Sackman, Beverly Hills, Cal., James Wolf, Charles Noneman, Cox, Castle & Nicholson, Michael J. Shelley, Potts & Richman, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TAKASUGI, District Judge.

This matter came before the court for trial in February 1983 on the issue of defendants' liability. Having considered all evidence introduced at trial, the argument of counsel and all documents filed herein, and having issued its Judgment in re Liability, the court now issues its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. All named plaintiffs and members of the plaintiff class in this consolidated action are retired or disabled construction laborers who were members of defendant Southern California District Council of Laborers, who participated in defendant Construction Laborers Pension Trust for Southern California and who last performed "covered" work under the Master Labor Agreement(s) prior to January 1, 1976.

2. Defendant Southern California District Council of Laborers ("defendant Union") is a labor organization comprised of various local unions located in Southern California and, at all relevant times, was the collective bargaining representative for plaintiffs.

3. Defendant Construction Laborers Pension Trust for Southern California ("defendant Trust") is a trust fund established pursuant to a collective bargaining agreement entered into by defendant Union and certain employer-contractors and which has been in effect since June 1962.

4. Defendant Board of Trustees of the Construction Laborers Pension Trust for Southern California ("defendant Trustees") is comprised of individuals selected by the collective bargaining parties to administer and manage defendant Trust.

5. The promulgation and adoption of all eligibility requirements and benefit levels under defendant Trust was within the sole discretion and power of defendant Trustees. Eligibility requirements and benefit levels were neither established nor mandated by the collective bargaining parties.

6. Between June 1962 and December 31, 1974, the eligibility provisions of defendant Trust required an employee to accrue a minimum of 15 years of credited service as a prerequisite to obtaining a vested right in or receiving pension benefits.

7. Between 1965 and 1967, defendant Trustees liberalized some of the eligibility and benefit provisions of defendant Trust including:

a. implementing a national "reciprocity" system;

b. providing for the payment of a full retirement benefit after 25 years of credited service regardless of age; and,

c. providing for joint and survivor benefits.

8. On October 21, 1969, defendant Trustees were presented with and rejected without discussion a resolution from Local No. 1119 requesting that defendant Trustees adopt a 5-year credited service requirement.

9. The hourly employer contribution rate into defendant Trust between 1969 and 1974 were as follows:

| | | |
|---|---|---|
| June 1, 1969—September 30, 1970 | — | $0.35 |
| October 1, 1970—July 31, 1971 | — | $0.60 |
| August 1, 1971—April 30, 1972 | — | $0.85 |
| May 1, 1972—July 31, 1973 | — | $1.10 |
| August 1, 1973—November 30, 1974 | — | $1.35 |

10. In 1970, relying upon the expected increases in the employer contribution rates, defendant Trustees determined to increase the monthly benefit factor.

11. In June 1970, defendant Trustees requested their actuarial consultant to study the feasibility of adopting a 10-year credited service requirement with respect to pension benefits. Subsequently, the actuary reported to defendant Trustees that such a modification of the credited service requirement would allow defendant Trustees to adopt a monthly benefit factor of $26.00. The actuary's conclusion was based upon his finding that the withdrawal of the 10- to 14-year employees from employment would no longer produce gains which were then being used to increase the benefit levels of longer service employees.

12. In September 1970, defendant Trustees increased the monthly benefit factor to $32.40 while retaining the 15-year credited service requirement.

13. The reasons allegedly underlying defendant Trustees' decision to increase the monthly benefit factor while retaining the 15-year credited service requirement were:

a. defendant Trustees' belief that employees who had accrued less than 15 years of credited service were not entitled to pension benefits;

b. defendant Trustees' goal of providing sufficient income to pensioners to enable them to retire in comfort; and,

c. defendant Trustees' goal of providing sufficient incentive to qualified employees in order to reduce employee turnover.

14. For purposes of the instant issue, it is assumed that all plaintiffs have accumulated more than 10 but less than 15 years of credited service during their participation in defendant Trust.

15. All plaintiffs were denied or would have been denied pension benefits on the basis that they had not accrued 15 years of credited service.

16. Approximately 148,219 persons participated in defendant Trust, i.e., had contributions made on their behalf, between June 1962 and December 31, 1974. Clerical errors which resulted in the multiple entry and use of participant names suggest that a downward adjustment of the above figure is warranted. However, no evidence was introduced indicating the extent of such an adjustment or that the adjustment would have an appreciable effect on the 148,219 figure. A valid and reliable approximation of the total number of persons who participated in defendant Trust during the relevant period is 148,219.

17. As of December 31, 1974, 28,424 participants were considered active participants, 6,002 participants had qualified for and began receiving pension benefits, and approximately 823 participants had vested rights to but had not yet begun to receive benefits. Thus, as of December 31, 1974, approximately 35,249 participants had not forfeited their rights to receive pension benefits under defendant Trust. The existence of inactive, unbroken service participants and participants working in other geographic areas under "reciprocity agreements" suggests that an upward adjustment of the above figure is warranted.

However, no evidence was introduced indicating the extent of such an adjustment or that the adjustment would have an appreciable effect on the 35,249 figure. A valid and reliable approximation of the total number of participants who, as of December 31, 1974 had not forfeited their rights to receive pension benefits under defendant Trust is 35,249.

18. On a national average, in pension plans which conditioned the right to pension benefits on the accrual of 11 or more years of credited service, the percentage of participants who forfeited their rights to receive pension benefits was approximately 92.5%.

19. The adoption of a 10-year credited service requirement in 1970 would have significantly increased the number of participants who would have vested as to pension benefits, i.e., would have significantly decreased the number of participants who forfeited their rights to receive pension benefits.

20. Between June 1962 and December 31, 1974, the amount of a monthly benefit payment was calculated by multiplying the years of credited service earned by a participant (at least 15 years) by a monthly benefit factor.

21. The monthly benefit factors adopted by defendant Trustees between June 1962 and December 31, 1974 were as follows:

| | |
|---|---|
| (January 1, 1963) | $ 2.67 |
| (July 1, 1965) | $ 5.40 |
| (June 1, 1966) | $11.75 |
| (December 1, 1969) | $13.75 |
| (October 1, 1970) | $32.40 |

22. As of the date of each increase in the monthly benefit factor, the monthly benefit payment to current retirees was adjusted in accordance with said increase.

23. The average monthly benefit and corresponding yearly benefit paid by defendant Trust between 1969 and 1974 were as follows:

| | | |
|---|---|---|
| (1969) | $213.00— | $2,556.00 |
| (1970) | $588.00— | $7,056.00 |
| (1971) | $596.00— | $7,152.00 |
| (1972) | $597.00— | $7,164.00 |
| (1973) | $585.35— | $7,024.20 |
| (1974) | $567.92— | $6,815.04 |

24. The average monthly amount of Social Security benefits paid to retired male workers (with and without reduction for early retirement) between 1969 and 1974 were as follows:

| | Without Reduction For Early Retirement | With Reduction for Early Retirement | |
|---|---|---|---|
| | | Before Reduction | After Reduction |
| (1969) | $117.78 | $109.16 | $ 97.06 |
| (1970) | $139.05 | $128.89 | $115.30 |
| (1971) | $156.39 | $144.06 | $129.84 |
| (1972) | $192.37 | $176.93 | $161.04 |
| (1973) | $197.00 | $181.00 | $164.20 |
| (1974) | $223.55 | $205.80 | $186.91 |

25. The approximate yearly amounts of post-retirement income provided to participants through pension benefits and social security (after reduction for early retirement) between 1969 and 1974 were as follows:

| | |
|---|---|
| (1969) | $3,720.72 |
| (1970) | $8,439.60 |
| (1971) | $8,710.08 |
| (1972) | $9,096.48 |
| (1973) | $8,994.60 |
| (1974) | $9,052.96 |

26. The base and maximum hourly wage rates for any job classification and the average hourly wage rate for *all* job classifications under the Master Labor Agreement between 1970 and 1974 were as follows:

| | Base Rate | Maximum Rate | Average |
|---|---|---|---|
| (June 15, 1970) | $4.54 | $5.07 | $4.71 |
| (October 1, 1970) | $4.595 | $5.12 | $4.76 |
| (May 1, 1971) | $4.995 | $5.55 | $5.19 |
| (August 1, 1971) | $5.045 | $5.595 | $5.23 |
| (May 1, 1972) | $5.495 | $6.145 | $5.70 |
| (May 1, 1973) | $5.945 | $6.595 | $6.14 |

27. Plaintiffs' expert witnesses and the actuarial assumptions adopted and utilized by the consultant to defendant Trust indicate that on the average employees earning benefits worked approximately 1,275 hours per year. Defendants, while contending that the above figure is low and that an upward adjustment is warranted, introduced no evidence establishing the average number of hours worked per year by pen-

sioners (employees receiving benefits) during the entire course of their participation in defendant Trust. Defendants did introduce evidence indicating that under various measures, i.e., high 3 years out of last 5 years worked—high 5 years—high 3 years, the average hours worked per year by pensioners were, respectively, 1,540 hours, 1,934 hours and 2,001 hours. However, it is impossible for the court to determine whether the above figures fairly and accurately mirror the average number of hours worked by pensioners over the *entire course of their participation in defendant Trust* and, therefore, the court declines to adopt them. A valid and reliable approximation of the average hours worked per year by employees receiving benefits is 1,500 hours (1,275 hours as modified by an upward adjustment of approximately 18%).

28. Under certain assumptions regarding the number of years of credited service accrued by participants, a $26.00 monthly benefit factor would have produced the following approximate average monthly (and corresponding yearly) benefits:

| Number of Years of Credited Service Accrued | Benefit |
| --- | --- |
| 15 | $390.00 – – $4,680.00 |
| 16 | $416.00 – – $4,992.00 |
| 17 | $442.00 – – $5,304.00 |
| 18 | $468.00 – – $5,616.00 |

29. The approximate yearly earnings for pensioners under various wage assumptions between 1970 and 1974 were as follows:

| | Assumes Base Rate | Assumes Max. Rate | Assumes Average Rate |
| --- | --- | --- | --- |
| (June 15, 1970) | $6,810.00 | $7,605.00 | $7,065.00 |
| (October 1, 1970) | $6,892.50 | $7,680.00 | $7,140.00 |
| (May 1, 1971) | $7,492.50 | $8,325.00 | $7,785.00 |
| (August 1, 1971) | $7,567.50 | $8,392.50 | $7,845.00 |
| (May 1, 1972) | $8,242.50 | $9,217.50 | $8,550.00 |
| (May 1, 1973) | $8,917.50 | $9,892.50 | $9,210.00 |

30. The benefit level adopted by defendant Trustees in 1970, in combination with Social Security benefits, resulted in the following income replacement ratios (assuming maximum preretirement hourly wage rates):

| | |
| --- | --- |
| (June 15, 1970) | 110% |
| (October 1, 1970) | 109% |
| (May 1, 1971) | 105% |
| (August 1, 1971) | 104% |
| (May 1, 1972) | 99% |
| (May 1, 1973) | 98% |
| (1974) | 91% |

31. A monthly benefit factor of $26.00, in combination with Social Security benefits, would have resulted in the following approximate income replacement ratios (assuming 15 years of credited service accrued and maximum preretirement hourly wage rates):

| | |
| --- | --- |
| (June 15, 1970) | 80% |
| (October 1, 1970) | 79% |
| (May 1, 1971) | 75% |
| (August 1, 1971) | 74% |
| (May 1, 1972) | 72% |
| (May 1, 1973) | 67% |
| (1974) | 69% |

32. The desired purpose of private pension systems is to provide, in combination with other sources of retirement income, retirees with sufficient income to maintain their preretirement standard of living during retirement.

33. Because of changes in tax liabilities and consumption patterns, the income required by a retiree to maintain his preretirement standard of living is less than 100% of his gross preretirement earnings. Generally, a replacement ratio of 60% to 80% of preretirement gross earnings will enable a retiree to maintain his preretirement standard of living.

34. In calculating the income replacement ratio, the amount of social security benefits which a retiree is receiving or will receive when he reaches retirement age (early or normal) is properly considered.

35. In determining the income replacement ratio, unemployment benefits, fringe benefits and wages from employment with other than a participating employer, i.e., an employer making contributions into defendant Trust, are not to be considered as preretirement income. Only actual wages earned by the retiree during the course of his employment with a participating employer are properly considered.

36. The normal work pattern for construction laborers covered by defendant

Trust results in a very high rate of employee terminations from the industry and from employment covered by defendant Trust.

37. The level of termination from covered work is extremely high among construction laborers as compared to workers in other industries and as compared to other job classifications within the construction industry.

38. The predominant reasons for the high level of termination from covered work among construction laborers are:

a. the dependency of the construction industry upon general economic conditions;

b. the physical severity of construction laborer work;

c. the high rate of disability among construction laborers;

d. the existence of low entry-level barriers; and,

e. the movement of some construction laborers to more highly skilled trades.

39. Because the primary reasons for the high level of job termination among laborers are unrelated to pension benefits or any expectation thereof, an increase in pension benefits would not provide any significant incentive to laborers to remain in the industry for 15 years or more nor significantly reduce the high turnover rate among laborers.

40. While an increase in the benefit level may have provided some incentive to laborers to remain in the industry, the $32.40 monthly benefit factor (and the corresponding 176% increase in the average monthly benefit paid) adopted by defendant Trustees and the resultant income replacement ratios far exceeded the recognized standards governing income replacement and were excessive, unwarranted and incongruous with the purposes underlying a private pension plan.

41. The purported goal of defendant Trustees to reduce employee turnover in the 10- to 14-year employee category is directly at odds with and contradictory of the conclusion of the actuarial consultant to defendant Trust, to wit, that the higher monthly benefit factor (and corresponding monthly benefit payments) eventually adopted by defendant Trustees could be maintained only if the termination rate in the 10- to 14-year employee category remained constant.

42. Defendant Trust is a separate and distinct entity from defendant Union.

43. Defendant Trustees are comprised of individuals selected by the collective bargaining parties, half of whom are selected by defendant Union.

44. The adoption and promulgation of eligibility requirements and benefit levels were within the exclusive domain and power of defendant Trustees. Eligibility requirements and benefit levels were not mandated by the collective bargaining parties nor were those eligibility requirements and benefit levels adopted by defendant Trustees subject to ratification by defendant Union.

45. No evidence was introduced to show that defendant Union in any way interfered with, or conspired to interfere with, the independent determinations and judgments of defendant Trustees.

46. No evidence was introduced to show that employees who had forfeited their rights to receive pension benefits lodged a complaint with or sought assistance from defendant Union regarding defendant Trust's retention of the 15-year credited service.

47. Assuming that employees had lodged a complaint with or had sought assistance from defendant Union regarding the 15-year credited service requirement, no evidence was introduced to show that defendant Union did not perform all duties required of it.

48. No evidence was introduced to show that the employees who had forfeited their rights to pension benefits utilized defendant Union's internal grievance procedure.

Any finding of fact which may be deemed a conclusion of law is incorporated into the Conclusions of Law section below, and any conclusion of law which may be

deemed a finding of fact is incorporated into the Findings of Fact section above.

## CONCLUSIONS OF LAW

1. 29 U.S.C. § 186(c)(5) imposes traditional fiduciary duties upon trustees of an employee trust and requires that such a trust be operated for the "sole and exclusive benefit" of its participants. *Hurn v. Retirement Fund Trust of the Plumbing, Heating and Piping Industry of Southern California*, 703 F.2d 386 (9th Cir.1983); *Ponce v. Construction Laborers Pension Trust for Southern California*, 628 F.2d 537 (9th Cir.1980); 29 U.S.C. § 186(c)(5).

■ 2. The primary purpose of 29 U.S.C. § 186(c)(5) is to insure that "as many intended employees as is economically possible" are awarded pension benefits. *Ponce*, 628 F.2d at 543.

■ 3. A trust is deemed to be "structurally deficient" when it arbitrarily and for no reasonable purpose excludes a large number of participants from receiving pension benefits. *Hurn*, 703 F.2d 386; *Ponce*, 628 F.2d 537; *Burroughs v. Board of Trustees of the Pension Trust Fund for Operating Engineers*, 542 F.2d 1128 (9th Cir.1976).

■ 4. A trust which is structurally deficient does not operate nor inure to the "sole and exclusive benefit" of all employees. *Hurn*, 703 F.2d 386; *Ponce*, 628 F.2d at 543; *Burroughs*, 542 F.2d at 1131.

■ 5. Because the instant eligibility requirements and benefit levels were adopted and established solely by defendant Trustees and were neither mandated by nor subject to ratification by the collective bargaining parties, the court possesses jurisdiction pursuant to 29 U.S.C. § 186(e) to review defendant Trust for purposes of determining whether a structural defect exists. *Hurn*, 703 F.2d at 391; 29 U.S.C. § 186(e).

6. The instant issue is whether the decision of defendant Trustees in 1970 to retain the 15-year credited service requirement constituted a structural defect in violation of 29 U.S.C. § 186(c)(5). *Ponce*, 628 F.2d at 544.

■ 7. Initially, the burden of proof rests with plaintiffs to demonstrate that defendant Trust's 15-year credited service requirement excluded an unusually high percentage of participants from receiving pension benefits. *Ponce*, 628 F.2d at 543.

8. Defendant Trust's 15-year credited service requirement excluded approximately 94.3% of all participants from receiving pension benefits. In comparison to the average national forfeiture rate (92.5%) and *on its face*, an exclusion rate of 94.3% was unusually high.

■ 9. Plaintiffs having met their initial burden of proof, the burden shifts to defendant Trustees to demonstrate that the decision to retain the 15-year credited service requirement in 1970 was based upon some reasonable purpose or objective. *Hurn*, 703 F.2d 386; *Ponce*, 628 F.2d at 543.

10. In determining the reasonableness of defendant Trustees' decision, the fact that in 1970 defendant Trustees chose to increase the then-existing benefit level must be considered. *Ponce*, 628 F.2d at 544.

11. In light of both the projected income replacement ratios which would have resulted from a monthly benefit factor of $26.00 and the income replacement ratios actually produced by the monthly benefit factor adopted by defendant Trustees in 1970, the level of benefits adopted by defendant Trustees in 1970 was unusually high and excessive.

12. The court having concluded that the 15-year credited service requirement excluded an unusually high percentage of participants and that the benefit level adopted by defendant Trustees in 1970 was excessive, the burden rests with defendant Trustees to demonstrate "a substantial and verifiable justification" for their 1970 decision. *Ponce*, 628 F.2d at 544.

13. Defendant Trustees have advanced the following three reasons in support of their decision in 1970 to increase the benefit level while maintaining the 15-year credited service requirement:

a. defendant Trustees' belief that employees who had accrued less than 15 years of credited service were not entitled to pension benefits;

b. defendant Trustees' goal of providing sufficient income to pensioners to enable them to retire in comfort; and,

c. defendant Trustees' goal of providing sufficient incentive to qualified employees in order to reduce employee turnover.

■ 14. Defendant Trustees' belief that the only employees deserving of pension benefits were those who had accrued 15 years of credited service does not constitute a reasonable basis or justification for their 1970 decision.

■ 15. Defendant Trustees' goal of providing sufficient income to pensioners in order to enable them to retire in comfort does not constitute a reasonable basis or justification for their 1970 decision. While the evidence indicates that some increase in the benefit level was warranted, the evidence also demonstrates that the benefit level adopted by defendant Trustees was "more" than adequate and clearly excessive, usually providing pensioners with post-retirement income in excess of 100% of their preretirement income.

16. "[A]lthough an increase in benefits to the upper range of the national average may arguably provide *some* incentive to employees to continue their participation in a pension plan, an additional increase in benefits to a point well beyond the upper range of the national average will do little, if anything, to further strengthen the incentive. In short, increasing pension benefits in the hope of enticing employees to continue in their employment reaches a point of diminishing returns... At some point, it is arbitrary and capricious for trustees to keep increasing pension benefits in the hope of encouraging employees to remain in the pension plan in *future years*." *Ponce*, 628 F.2d at 544.

■ 17. Defendant Trustees' goal of providing sufficient incentive to qualified employees in order to reduce employee turnover does not constitute a reasonable

basis or justification for their 1970 decision. The evidence adduced simply does not support defendants' contention.

18. The reasons advanced by defendant Trustees in support of their decision in 1970 to increase the benefit level while retaining the 15-year credited service requirement, singularly and collectively, fall short of establishing "a substantial and verifiable justification" for defendant Trustees' decision and fail to demonstrate that said decision was based upon any reasonable goal or objective. *Hurn*, 703 F.2d 386; *Ponce*, 628 F.2d 537.

19. "Absent a substantial and verifiable justification, it is arbitrary and capricious for trustees both to maintain a vesting requirement with a high exclusion rate and at the same time to pay an unusually high level of benefits." *Ponce*, 628 F.2d at 544.

■ 20. Defendant Trustees' decision in 1970 to maintain the 15-year credited service requirement and to increase the benefit level was arbitrary and capricious and constituted a structural defect violative of 29 U.S.C. § 186(c)(5). *Hurn*, 703 F.2d 386; *Ponce*, 628 F.2d 537; *Burroughs*, 542 F.2d 1128.

21. Defendant Trust and Trustees are liable for a violation of 29 U.S.C. § 186(c)(5).

22. No evidence has been introduced which would support a finding that defendant Union violated 29 U.S.C. § 186(c)(5) and, therefore, no liability attaches to said defendant.

■ 23. A labor organization owes a duty of fair representation to its members. Said duty requires the labor organization to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).

24. The court possesses jurisdiction over plaintiffs' breach of fair representation claim pursuant to 29 U.S.C. § 186(c) and 28 U.S.C. § 1331.

25. Defendant Union has not breached its duty of fair representation to plaintiffs.