**Gina DEVITO, Charles Castelli, Ralph Vampini, and Ruth Gordon, as Trustees of Local 1245 General Benefits Funds,** Plaintiffs,

v.

**HEMPSTEAD CHINA SHOP, INC., Defendant.**

No. CV 91–5077 (ADS).

United States District Court, E.D. New York.

Oct. 22, 1992.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiffs; Patricia McConnell, Joyce Tichy, of counsel.

Rains & Pogrebin, P.C., Mineola, N.Y., for defendant; Mark N. Reinharz, of counsel.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This ERISA case raises what appears to be a novel issue in this Circuit, namely, whether a participating employer in a multiemployer employee benefit fund is obligated to continue making contributions when the Trustees reduce benefit levels as the result of the abrupt and catastrophic departure of the major employer from the Fund.

In the instant case, the plaintiff Trustees move for summary judgment, pursuant to Fed.R.Civ.P. 56, granting them mandatory relief under 29 U.S.C. § 1132(g)(2), based upon a claim that the defendant employer, Hempstead China Shop, Inc., failed to make required contributions to the employee welfare benefit fund as required under the provisions of ERISA. The defendant employer is also moving for summary judgment, dismissing the complaint, and for leave to amend its Answer to add a counterclaim. Oral argument of these motions was heard by the Court on October 16, 1992.

## FACTUAL BACKGROUND

This action was brought pursuant to 29 U.S.C. §§ 1132 and 1145 ("ERISA") to collect delinquent contributions due to the plaintiff Local 1245 General Benefits Fund ("the Fund") from defendant Hempstead China Shop ("Hempstead China" or "the employer"), pursuant to the terms of a collective bargaining agreement with Local 1245 which was in effect from April 1, 1989 through March 31, 1992. The agreement obligated Hempstead China to make specified monthly contributions to the Fund on behalf of all eligible full-time and part-time employees in the Local 1245 bargaining unit. The plaintiffs claim that the defendant violated section 14 of the bargaining agreement by failing to make any contributions for the month of April 1989 and for the twenty-month period from August, 1990 through the Agreement's expiration in March, 1992.

United Food and Commercial Workers Local 1245 ("the Union") and the Local 1245 Health Fund is the successor to the Local 1245 General Benefits Fund. The Local 1245 Health Fund is an ERISA multiemployer, welfare benefits fund established by the Union and employers who were parties to collective bargaining agreements with the Union. It was jointly administered by equal numbers of employer-appointed and union-appointed Trustees. The predecessor General Benefits Fund

provided health benefits to the employees of contributing employers.

When Hempstead China joined the Fund, Time Square Stores ("TSS") was the largest contributing employer to the General Benefits Fund, employing approximately 1,600 of the Fund's 1,750 participants. Of the remaining 150 participants employed by ten other contributing employers, Hempstead China was the second largest employer with 75 participants. In October, 1989, TSS abruptly notified the Fund that it intended to close all of its stores and lay off all of its employees by December 31, 1989. TSS thereafter instituted Chapter 11 bankruptcy proceedings.

The unanticipated closing of TSS represented an overnight loss of 88% of the Fund's income, while the Fund remained obligated to pay claims incurred by TSS participants as well as those of the remaining employers. The Fund's monthly income was reduced from approximately $81,000 to $10,000. The Plan Administrator advised the Trustees that the current contributions from the remaining employers would be grossly inadequate to pay for the existing schedule of benefits. Consistent with their fiduciary obligations under ERISA, the Trustees were presented with three alternatives: (1) require the remaining employers to increase immediately their contributions by a staggering amount; (2) immediately reduce benefits to a level that could be supported by the current contributions of the remaining employers; or (3) terminate the Fund or merge it into another plan. The Trustees chose the second option and reduced the level of benefits. That action eliminated hospital medical and surgical benefits, major medical, and life insurance benefits. Only dental, optical and prescription coverages were retained.

On December 11, 1991, the Local 1245 General Benefits Fund was merged into the Local 1245 Health Fund, which became the surviving entity.

In its Answer, the defendant contends that its obligations to contribute to the Fund were contingent on the Fund's maintenance of particular benefit levels. Since the benefit levels were substantially reduced, Hempstead China argues that it was not required to pay the contractual contributions to the Fund.

## PROCEDURAL SETTING

### A. *Plaintiffs' Motion for Summary Judgment*

The plaintiffs move for summary judgment on the complaint awarding them money damages in the amount of the withheld contributions. The plaintiffs also seek additional relief in the form of a mandatory award of interest and attorney's fees under section 502(g)(2) of ERISA.

The Local 1245 General Benefits Fund was administered pursuant to the collective bargaining agreement and the Declaration of Trust, which provided that the Trustees had broad authority to administer the fund and set benefit levels. In their Rule 3(g) Statement, the plaintiffs outline the health contributions required of the employer to the Plan based upon Section 14 of the 1986–1989 collective bargaining agreement. That section provides that the employer "shall on the 10th day of each and every month during the period of this Agreement, contribute ... the following amounts to insure and protect the health benefits presently enjoyed by the employees." The provision then delineates the actual dollar contribution per month to be made for each full-time and part-time employee, and provides for increments in each year of the contract.

The Rule 3(g) Statement also provides as follows:

"11. The Trustees understood Article 14 to require Hempstead China to contribute the amounts specified therein throughout the term of the contract, regardless of the benefit levels set by the Trustees....

16. In December, 1989, the Trustees voted to adopt a reduced schedule of benefits based upon current contribution income....

19. In November, 1991, the Trustees, exercising their authority under the Trust Agreement, voted to merge the Fund into the Local 1245 Health Fund

effective December 11, 1991, and the merger was approved by the voting contributing employees and the Union."

The plaintiffs also provided an affidavit from Vincent A. DeVito, President of United Food and Commercial Workers Local 1245, AFL–CIO. DeVito states that after the demise of TSS, the Union offered the remaining employers a mid-term modification of their contracts, although they were under no obligation to do so, because the sudden closure of TSS was so unexpected and "had such a devastating impact on the financial health of the General Benefits Fund." DeVito adds that "six contributing employers agreed to amend their collective agreements mid-term to provide for contributions to the Health Fund, instead of the General Benefits Fund, but Hempstead China did not."

In November 1991, the Trustees exercised their authority under paragraph 25 of the Trust Agreement and voted to merge the General Benefits Fund into the larger and apparently more stable Local 1245 Health Fund, and that action was approved by a majority of the contributing employers as well as by the Union. According to DeVito, the Agreement covering 1989–1992

"... did not commit the Fund to provide any particular type of benefits, but rather committed Hempstead China to contribute a specified amount each and every month per eligible employee to the General Benefits Fund; and Hempstead China's contribution obligation was not dependent on the Fund's provision of any level of benefits ..." (DeVito Affidavit, ¶ 11).

### B. *Defendant's Summary Judgment Motion*

In addition to moving for summary judgment dismissing the complaint, the defendant moves pursuant to Fed.R.Civ.P. 13 for leave to file a counterclaim. In support of the motion, the defendant provides the affidavit of Henry Poronoff, Vice–President of Hempstead China Shops, Inc. According to Poronoff, "the Fund is asking Hempstead China to make contributions in clear contravention of our collective bargaining agreement and despite the fact that it has refused to provide employees with health insurance benefits" (Poronoff Affidavit, ¶ 2).

The defendant also relies upon Section 14 of the Agreement, but places the emphasis on different elements in that provision than those stated by the plaintiffs:

"A. The employer shall on the tenth day ... contribute to Local 1245 General Benefit Fund the following amounts *to insure and protect the health benefits presently enjoyed by the employees.*

1. Effective April 1, 1989, the Employer shall increase contributions to the General Benefits Fund for all eligible full-time employees to ninety-five ($95.00) dollars per month *to maintain the current level of benefits.*" (emphasis in the original).

The defendant employer argues that the language "insuring and protecting" the benefits "presently enjoyed," and maintaining the "current level of benefits," obligated the Fund to provide, in an unqualified manner, the same type of benefits and the same level of benefits throughout the life of the collective bargaining agreement. Poronoff then asserts the following:

"13. The Roosevelt Field employees bitterly complained to me and a number of other management employees about their lack of health insurance ... We were also concerned in that we were still making the same contributions despite the fact that no health insurance benefits of any kind were being provided, i.e., we were paying something for nothing....

17. To make matters worse, it became obvious that the Fund was treating Hempstead China employees differently than other employees in the Fund.... a number of employees began to complain to us that they were not being reimbursed for claims they had submitted.

\* \* \* \* \* \*

32. ... Because the Fund did not maintain the current level of benefits, i.e., the condition precedent, we had no obligation to make any further contributions....

33. Not only does the collective bargaining agreement support Hempstead Chi-

na's position that it was under no obligation to make contributions to the Fund, the Fund's own documents are consistent with Hempstead China's position. For example, in the Booklet provided to all beneficiaries of the Fund, it specifically states the following:

'**TERMINATION OF YOUR COVERAGE**

Your coverage shall terminate on whichever of the following dates occurs first; 12:01 a.m. Standard Time on: ...

(c) *plan modification to terminate a particular type of coverage under the plan* ...' " (emphasis in the original). Based on this language, the defendant contends that because health insurance benefits were eliminated in its employees case, a particular type of coverage was terminated, and therefore, no contributions need have been made to the Fund.

The defendant sets forth many other arguments, most of which are unrelated to the core of this summary judgment motion. Only three of those contentions warrant mention here: (1) because Hempstead China employees were not reimbursed, according to Ponoroff, for the "meager benefits" which they were left—a point which the plaintiffs vigorously debate—Ponoroff claims the Fund breached its fiduciary obligation, and to require the defendant to make additional contributions would be nothing more than a windfall to the Fund; (2) the defendant is not required to pay because the collective bargaining agreement specifically stated that Hempstead China would contribute to the *General Benefits Fund,* and did not agree to pay the Local 1245 Health Fund "which apparently came into play on January 1, 1992;" and (3) contributions to the Fund would violate the requirements of § 302(c)(5) of the LMRA that such contributions be for the "sole and exclusive benefit" of the employees of Hempstead China.

## THE GOVERNING LAW

A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact," *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 [2d Cir. 1990], and the movant is entitled to judgment as a matter of law (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see also* Fed.R.Civ.P. 56[c]). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 [2d Cir.1990]; *Liscio v. Warren,* 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 [2d Cir.1986], *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987]).

Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990] [quoting Fed.R.Civ.P. 56[e]; *see National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 [2d Cir.1989]). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party" (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see Converse v. General Motors Corp.,* 893 F.2d 513, 514 [2d Cir.1990]).

However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990]). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable (*see Rattner v. Netburn,* 930 F.2d 204 [2d Cir.1991]). Finally, the Court is charged with the function of "issue finding", not "issue resolution" (*Eye Assocs., P.C. v. Incomrx Sys. Ltd. Partnership,* 912 F.2d 23, 27 [2d Cir. 1990]).

## DISCUSSION

Section 14(A)(1) of the collective bargaining agreement provides as follows:

"A. The Employer *shall* on the tenth (10th) day of each and every month during the period of this Agreement, contribute to Local 1245 General Benefit Fund the following amounts to insure and protect the health benefits presently enjoyed by the employees ..." (emphasis supplied).

The plaintiffs argue that the Fund was not a party to and had no obligations under the Agreement. Counsel for the plaintiffs adds that like the Union and Hempstead China, the Fund Trustees never understood Section 14 to mean that Hempstead China's obligation to contribute to the Fund was conditioned on the Fund's provision of any level of benefits. Ultimately, the plaintiffs argue that the language of the 1989–1992 Memorandum Agreement did not create a precondition to Hempstead China's fixed dollar contribution obligation. Counsel notes the following:

"16. ... no one understood Hempstead China to be obligated to pay all amounts necessary to maintain the existing benefits level ... Everyone understood that Hempstead China had agreed to pay a fixed amount in each of the contract's three years, and not a penny less or more even if the actual cost of providing benefits increased or decreased over the contract term.

18. ... When Hempstead China finally signed the Agreement, the benefits provided to the General Benefits Fund participants had been greatly reduced for a period of three months, as Hempstead China was well aware. With full knowledge of the reductions from the 1989 level, Hempstead China executed the Agreement and continued to pay the contribution rate specified therein through July 1990." (Plaintiffs' Rule 3[g] Statement).

The plaintiffs accuse the defendant employer of "creative contract interpretation" that will afford the defendant "the opportunity to evade its obligations."

In turning to the "Agreement and Declaration of Trust" dated June 1, 1982, the Court notes the following language in paragraph 6:

"(g) The Trustees shall have full authority with respect to selection of benefits, coverage and eligibility, priorities among classes of benefits, methods of arranging for provision for benefits, investment of Trust Funds, and all other related matters. *Without in any way limiting the generality of the foregoing,* the Trustee shall have full authority to establish different and varying benefits for various classifications of employees, employees of various companies, length of service or seniority for eligibility, benefits, coverage by units, shops, companies, employers, age, sex, lay-off, suspension, discharge, or other interruption of termination of employment" (emphasis supplied).

The Court finds that the Trustees acted fully within their authority under this provision as well as within their fiduciary duty when they chose the option to reduce the benefits level to one that could be supported by the then-current level of contributions from the remaining employers. Contrary to the defendant's argument, the plaintiff Fund did not totally eliminate the employees' benefits, although those benefits were significantly reduced.

Having made this determination, the Court turns to Section 515 of ERISA, which provides in pertinent part as follows:

"Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

In *Benson v. Brower's Moving & Storage Co.,* 907 F.2d 310 (2d Cir.), *cert. den.,* —— U.S. ——, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990), the Second Circuit considered the defenses available to an employer sued by a union pension fund for delinquent contributions. The defendant employer maintained that it had no obligation to make the contributions because the union local had abandoned the collective bargaining agreement. The district court granted the plaintiff Fund's motion for summary judgment,

holding that Section 515 of ERISA precluded the defendant employer from raising the union's abandonment of the collective bargaining agreement as a defense against the Fund (*see* 726 F.Supp. 31 [E.D.N.Y.1989]). The employer appealed.

This Court relies upon *Benson* because the Second Circuit's reasoning is determinative of the primary issue presented in these motions, namely, whether Hempstead China is obligated to pay the delinquent contributions and whether its defense that the Fund was required to maintain the prior level of benefits as a condition precedent is legally appropriate. In *Benson*, the Second Circuit spent considerable time reviewing the legislative history of Section 515 and the Congressional intent in undertaking such legislation. Mindful of that review, this Court concludes that Congress clearly intended to deal with the type of situation presented in the instant case, namely, what happens when an employer ceases making contributions to a fund as mandated by a collective bargaining agreement?

The employer in *Benson* responded with a two-part defense. First, it argued that a valid collective bargaining agreement is a jurisdictional prerequisite to liability under section 515 and that the collective bargaining agreements in question were invalid and unenforceable because they had been "abandoned" by the union (*Benson v. Brower's Moving & Storage Co., supra,* 907 F.2d at p. 311). Second, the employer maintained that the district court had no jurisdiction to decide the validity of the collective bargaining agreement, and therefore the action had to be dismissed (*id.*).

In response to these contentions, the district court held:

"(1) abandonment amounts to *a defense going to the enforceability of the contract and contractual defenses available against a union may not be raised against a benefit plan by virtue of section 515 of ERISA*, and (2) even if such defenses could be raised, a district court has jurisdiction to determine the validity of a collective bargaining agreement under LMRA section 301(a), 29 U.S.C.

§ 185(a) (*id.* at p. 312) (emphasis supplied).

The language of *Benson* is most instructive, and is relied upon by the Court in its determination of the instant case. First, Judge (now Chief Judge) Meskill noted the following:

"[the employer] thus raises the same cry as countless other employers across the country: 'Why must I contribute to a plan when no "real" collective bargaining agreement exists?' The short answer and the one we find dispositive is that Congress intended to insulate benefit plans from exactly these defenses in adding section 515 to ERISA" (*id.* at p. 313).

The Second Circuit then addressed the legal relationship between the Fund, the employer, and the union as follows:

"The Funds occupy the position of a third party beneficiary of the collective bargaining agreement between Brower's (promisor) and Local 814 (promisee) [citation omitted]. Third party beneficiaries generally are subject to defenses that the promisor could raise in a suit by the promisee [citations omitted]. That is, they step into the shoes of the promisee. Collective bargaining agreements, however, are an exception to the general rule [citations omitted]. In [*Lewis v. Benedict Coal, [Corp.,]* the Court held that an employer could not raise the union's breach of the collective bargaining agreement as a defense against an employee benefit plan suing for delinquent contributions unless the collective bargaining agreement preserved such a defense in 'unequivocal words'" 361 U.S. 459 at 470–71 [80 S.Ct. 489 at 496, 4 L.Ed.2d 442]" (*id.*).

As is further noted in *Benson*, some employers attempted to escape their contribution obligations in the wake of *Benedict Coal* by adopting a new strategy. Instead of arguing that a union had breached the collective bargaining agreement, the employers began raising defenses going to the formation of the agreement itself, on a theory of fraud in the inducement. In response to this tactic, Congress added Section 515 to ERISA. The court in *Benson*

reflected upon the result of the addition of Section 515 as follows:

"Simply put, benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations ... For this reason, Congress placed employee benefit plans in a position superior to the original promisee, analogous to a holder in due course" (*Benson* at p. 314).

In *Benson*, the Second Circuit considered decisions by other Circuit courts which also unanimously construed Section 515 as a limitation on the defenses available to an employer when sued by an employee benefit plan.

Ultimately, in *Benson*, the Second Circuit came to the following, substantive finding:

"Our research has disclosed only two defenses recognized by the courts: (1) that the pension contributions themselves are illegal [citations omitted], and (2) that the collective bargaining agreement is void (not merely voidable) [citations omitted] ... Thus, once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole [citations omitted] ... 'nothing in ERISA makes the obligation to contribute [to a benefit plan] depend on the existence of a valid collective bargaining agreement'" [citations omitted] (*id.*).

The Second Circuit, concluding that the legislative intent in adding Section 515 was unmistakable despite the fact that the result "may seem quite harsh," further stated:

"Our task, today, however, is merely to enforce Congress' desire that benefit plans be able to rely on the written agreements presented to them. We note that an employer's liability in this situation is not limitless because an employer is liable under section 515 only for the effective period of the collective bargaining period. *See* [*Laborers Health and Welfare Trust Fund v.*] *Advanced Lightweight* [*Concrete Co.,*] 484 U.S. [539] at pp. 548–549, 108 S.Ct. [830] at [pp.] 835–36 [98 L.Ed.2d 936 (1988)]" (*Benson* at p. 316).

The legislative intent in this field is clear. In this case, the employer's defenses do not fall into defense category (1) since there is no argument by either side that the pension contributions themselves are illegal, nor into defense category (2) since the collective bargaining agreement is not void.

*Benson* has been subsequently followed in other Circuits—for example, in *Berry v. Garza*, 919 F.2d 87 (8th Cir.1990), the Eighth Circuit reversed the district court's grant of summary judgment in favor of the employer in circumstances where the employer claimed that the union did not have majority status at the time the collective bargaining agreement was executed. The Eighth Circuit held that the employer who knowingly entered into a facially valid collective bargaining agreement was estopped from valid collective bargaining agreement was estopped from raising the defense of lack of majority status of the union in an attempt to avoid his obligations to the multiemployer fund.

Even prior to *Benson*, the Seventh Circuit observed the following:

"[d]efenses based on fraud in the inducement, oral side agreement, course of performance, want of consideration, failure of the union to have majority support ... are as a class the defenses *most* likely to breed litigation even when asserted in good faith, and they create manifold opportunities for manipulation by crafty operators" (*Central States v. Gerber Truck Service, Inc.*, 870 F.2d 1148 [7th Cir.1989]).

Defenses such as these which go to the formation or validity of collective bargaining provisions have uniformly been disallowed in the ERISA context in actions brought by pension plans to enforce employer contributions. For example, an employer who was sued by a pension plan to collect delinquent contributions could not raise affirmative defenses of failure or lack of consideration, absence of a meeting of the minds regarding the extent to which

payments to the funds were to be made, or failure to reach an agreement to make payment to the funds (*see Massachusetts Laborers Health & Welfare Fund v. Explosives Engineering*, 136 F.R.D. 24 [D.Mass. 1991]).

As the District Court of Massachusetts noted in *Explosives Engineering*, employee benefit plans are insulated from such defenses because they are not parties to the agreement between the union and the employer. This Court supports that premise, noting that the plaintiff Fund was not a party to the collective bargaining agreement between the Union and Hempstead China. Section 515, if it says nothing else, means that when the Trustees are not implicated in any alleged misconduct, the Trustees' suit cannot be thwarted by defenses not apparent from the face of the Agreement (*see Bituminous Coal Operators' Association Inc. v. Connors*, 867 F.2d 625, 634 [D.C.Cir.1989]). In the instant case, there has been no allegation of any misconduct on the part of the Trustees, and there is no defense on the face of the collective bargaining agreement which goes to a reduction in benefit levels as a result of the abrupt and catastrophic departure of the major employer from the Fund.

The Court finds the defendant's reliance upon *Challenger Caribbean Corp. v. Union General de Trabajadores de Puerto Rico*, 903 F.2d 857 (1st Cir.1990) and *Milwaukee Co. v. Basin Produce Corp.*, 396 F.Supp. 528 (E.D.Wash.1975) is misplaced. *Challenger Caribbean* involved an alleged condition precedent in a collective bargaining agreement with regard to production standards and the layoff of employees when a facility closed. The issue in *Milwaukee Co.* focused upon a purported condition precedent in a lease dealing with a landlord's duty to repair and the tenant's liability for damages. Neither of these cases deal with the unique circumstances of benefit funds under ERISA.

Further, the Court finds *Scotto v. Brink's Inc.*, 962 F.2d 225 (2d Cir.1992) and *NLRB v. Amax Coal*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981) to be clearly distinguishable. In *Scotto*, the Second Circuit determined that an employer was not required to make contributions to a health fund based on hours of vacation and sick time *earned* during the term of the collective bargaining agreement but not *taken* until after its expiration. In the instant case, the Fund is not seeking contributions for any period of time after the expiration of the collective bargaining agreement. In *Amax Coal*, the Supreme Court was dealing with the fiduciary duty of a plan trustee. Although the defendant employer in the instant case claims that the Court in *Amax Coal* was warning employee benefit funds that they had no authority to tamper with contribution rates set by the parties to the collective bargaining agreement, the Supreme Court was actually distinguishing collective bargaining representatives from benefit fund plan trustees. Specifically, the Supreme Court noted the following:

> "The atmosphere in which employee benefit trust fund fiduciaries must operate, as mandated by § 302(c)(5) and ERISA, is wholly inconsistent with this process of compromise and economic pressure.... Indeed, the trustees have an obligation to *enforce* the terms of the collective bargaining agreement regarding employee fund contributions against the employer 'for the sole benefit of the beneficiaries of the fund'" (*NLRB v. Amax Coal Co., supra*, at pp. 336, 337 [101 S.Ct. at pp. 2798, 2798], *quoting United States v. Carter*, 353 U.S. 210, 220 [77 S.Ct. 793, 798, 1 L.Ed.2d 776]).

The Court further finds it unnecessary to address the defendant's argument based upon *Demisay v. Local 144 Nursing Home Pension Fund*, 935 F.2d 528 (2d Cir.1991), in which the Supreme Court granted *certiorari* (see 112 S.Ct. 2990 [1992]). In *Demisay*, the employer contributions had created fund reserves which represented future benefits for which the employees had foregone past wages. In *Demisay* and *Local 50, Bakery and Confectionery Workers Union, AFL–CIO v. Local 3 Bakery and Confectionery Workers Union, AFL–CIO*, 733 F.2d 229 (2d Cir.1984), both of which are relied upon by the defendant, the employees withdrew from the initial fund and

became participants in a different fund, at which point they laid claim to the reserves in the original fund. The Second Circuit in *Demisay* determined that the reserves should be transferred to the new fund. In the instant case, the monies at issue do not represent reserves to be paid out for future coverage, and there is no other union-employer fund to which the monies could have been transferred since the defendant's employees now have no union representation. Rather, the issue concerns delinquent contributions which were never made by Hempstead China during a 20–month period when the employees were participants in the Fund.

As the Seventh Circuit noted in *Central States v. Gerber Truck Service, Inc., supra*, 870 F.2d at p. 1149, the courts find that Section 515 places the pension fund in a better position, analogous to a holder in due course, "entitled to enforce the writing without regard to the understandings or defenses applicable to the original parties." *Benson* reinforced this proposition and remains the leading case in this Circuit on the issues relevant to the instant case. Accordingly, despite what may appear to be a "harsh result," the plaintiffs' motion for summary judgment is granted.

Consistent with *Benson*, the Court also finds that the Funds are entitled to recover interest, reasonable attorney's fees and costs incurred under 29 U.S.C. § 1132(g)(2).

### CONCLUSION

Based upon the above findings and conclusions, the plaintiffs' motion for summary judgment pursuant to Fed.R.Civ.P. 56, granting mandatory relief under 29 U.S.C. § 1132(g)(2) is granted. The plaintiffs are awarded partial summary judgment on the liability portion of this action, and the case is set down for a conference on November 4, 1992, at 9 a.m. in Courtroom "A" of the Uniondale Courthouse, to determine whether an assessment of damages is required.

As to attorney's fees, the attorneys for the plaintiffs are directed to serve and file an affidavit as to the services rendered on or before November 4, 1992. The attor-neys for the defendant are directed to respond on or before November 13, 1992.

The defendant's motion for summary judgment dismissing the complaint is denied. The defendant's motion to amend its Answer to assert a counterclaim is also denied.

SO ORDERED.